UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

NORMA E. MOODY,

    Plaintiff,

v.                                                    Case No:   6:14-cv-1472-Orl-18TBS

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____

## REPORT AND RECOMMENDATION

Plaintiff Norma E. Moody brings this action pursuant to the Social Security Act (the "Act"), as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits under the Act.  Upon review of the record, including the transcript of the proceedings before the administrative law judge ("ALJ"), the ALJ's decision, the exhibits, pleadings and memoranda submitted by the parties, and for the reasons that follow, I respectfully recommend that the Commissioner's final decision be reversed and remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

### I. Background

Plaintiff protectively filed for a period of disability and disability insurance benefits on October 19, 2011 (Tr. 21).  She alleged an onset of disability on November 12, 2010, due to diabetes, spinal column at C4-C5, lower back injury, numbness in left hand, upper and lower back pain, neck pain, and obesity (Tr. 191).  Her application was denied initially and after reconsideration (Tr. 106-07; 113-14).  Plaintiff requested and received

an administrative hearing that was held on January 10, 2013 (Tr. 119-20; 36-83).   At the time of the hearing, she was 48 years old.   In a decision dated May 2, 2013, the ALJ found Plaintiff not disabled as defined in the Act through the date of his decision (Tr. 18-35).   Plaintiff timely filed a request for review of the ALJ's decision, which the Appeals Council denied on June 13, 2014 (Tr. 1-3, 17).   Consequently, the ALJ's unfavorable decision is the Commissioner's final decision in the case (Tr. 1).   Plaintiff timely filed this action for judicial review (Doc. 1).   She has exhausted all available administrative remedies and the case is properly before the Court.

## II. Agreed Facts[1]

[Plaintiff] was confronted with significant medical issues that surfaced in the later portion of 2010 (Tr. 21, 43).   Ms. Moody began grappling with neck and shoulder pain, insomnia, vision problems, some dyspnea on exertion, and joint issues coupled with left arm numbness (Tr. 43, 362-65).   Ultimately, the functional aspects of this job were too overwhelming for Ms. Moody to physically handle (Tr. 43, 82-83).   As a result by the end of the work day, she was sobbing due the symptoms springing from these conditions (Tr. 43).   Sadly, these impairments forced Ms. Moody to resign from a career she loved (Tr. 43, 82-83, 222); see also (Tr. 29, 78-79 -where the ALJ agreed that Plaintiff is incapable of performing any of her PRW).

Thereafter, Ms. Moody sought treatment for her health problems (especially in regard to neck and arm pain) (Tr. 362-65).   For this, she established regular care at Titusville Family Practice under the direction of primary care physicians (PCP), Drs. Raguindin and Pagan (Tr. 317-98, 475-534); see also (Tr. 365 - where an overnight oximetry (oxygen) was prescribed).   Dr. Pagan examined Plaintiff in April 2011, and noted Plaintiff had a smooth gait, and a normal station, with mildly restricted range of motion (ROM) in the cervical spine (Tr. 511).   She displayed intact cranial nerves, 2+/4+ and symmetrical deep tendon reflexes, and normal response to light touch, pain, pin prick, stereognosis, and vibration (Tr. 511).   Due to Ms. Moody's complaints, Dr. Pagan immediately ordered an X-ray for her neck (Tr. 385).   This April of 2011 cervical spine (CS) x-ray showed degenerative disc disease (DDD) with dorsal osseus ridging at C4-5 (Tr. 385).

At Ms. Moody's subsequent encounter with Dr. Pagan, he recorded similar symptomology (Tr. 357-60).   In consequence, he referred her to an endocrinologist for diabetic management (Tr. 361); see also (Tr. 518, 652, 658, 662 -where Ms. Moody has

---

[1] The parties agree on all of the information in this section, which comes directly from their Joint Memorandum (Doc. 19 at 2-8)

had elevated HB A1C levels).[1] Dr. Pagan also realized she needed a physiatrist to assist Ms. Moody in dealing with her pain complaints (Tr. 360). After that, Ms. Moody began regular treatment at Brevard endocrinology (Dr. Go) (Tr. 281-93) and with Patrick Sonser, M.D., (physiatrist) physical medicine and rehabilitation specialist (Tr. 399-455); see also (Tr. 455 - where on initial consultation Dr. Sonser noted pain levels of 10/10 (with sharp/shooting pain), weakness in bilateral hands/arms, and numbness and tingling in her left arm). Dr. Sonser performed a series of two cervical spine injections to address her neck problems (with some improvement) (Tr. 416, 425, 430).

Dr. Pagan probed further concerning Ms. Moody's health. He ordered further diagnostic testing.[2] Ms. Moody had a brain MRI due to her complaints of dizziness (Tr. 307 – normal October 28, 2011, brain MRI); see also 294-316 - where Ms. Moody was referred to neurologist, Leila Patallo, M.D., for her complaints of dizziness, 327). Dr. Pagan administered Tramadol and DemoMedrol injections for her pain (Tr. 346-47, 352, 356).[3] An upper extremities EMG was performed on June 14, 2011 (Tr. 303-06). This test confirmed left ulnar neuropathy across the elbow and the beginning of bilateral carpal tunnels syndrome. Id. Since it became apparent that surgery might be necessitated for Ms. Moody's ulnar neuropathy (Tr. 333, 335, 337, 440), Dr. Pagan recommended that Ms. Moody seek medical attention from Dr. Aaron Smith, neurologist (Tr. 337, 440 - where Dr. Smith diagnosed Ms. Moody with both C5 radiculopathy[4] and left ulnar nerve neuropathy, 535-37). Dr. Smith performed a left arm ulnar release in August of 2011 (Tr. 412, 437).

[1] "HB A1C, glycated hemoglobin test or glycohemoglobin, is an important blood test that shows how well your diabetes is being controlled." [sic] http://www.webmd.com/diabetes/guide/glycated-hemoglobin-test-hba1c
[2] Other diagnostic testing included chest X-rays (Tr. 377, 595), numerous ECGs (Tr. 302, 375-76, 379, 382, 384), bilateral venous study (Tr. 617), Video ENG report (Tr. 298- 300 - abnormal ENG which indicated peripheral or central vestibular dysfunction), and testing for lower extremity peripheral artery disease (PAD). This test confirmed PAD of mild to moderate severity (Tr. 537).
[3] Due to Ms. Moody's right shoulder complaints, a MRI was performed. This September 15, 2011, right shoulder MRI revealed mild degenerative changes and tendinosis (swelling and pain of a tendon) (Tr. 374).
[4] Radiculopathy is the "irritation of or injury to a nerve root (as from being compressed) that typically causes pain, numbness, or weakness in the part of the body which is supplied with nerves from that root." [sic] http://www.merriam-webster.com/dictionary/radiculopathy

Ms. Moody's low back and leg pain flared up in late 2011 (Tr. 318, 394, 395 – back symptoms persistent, 408 - where Ms. Moody had diminished bilateral lateral femoral cutaneous nerve distribution, 412). A November of 2011 lumbar spine MRI showed: (1) multilevel lumbar spondylosis (degenerative osteoarthritis of the spine) with inflammation noted in the left L1-2 and bilateral L2-3 to L5-S1 facet joints, (most pronounced at L4-5 and L5-S1), (2) DDD at T12-L1 and L4-5, (3) L4-5 disc displacement, and (4) spondylosis resulting in left foraminal stenosis and slight wedge deformity at T12 (Tr. 401). In December of 2011, Dr. Raguindin referred Ms. Moody to physical therapy for her unrelenting lower back symptoms (Tr. 369). But Ms. Moody was unable to tolerate the initial evaluation secondary to pain (was in tears) (Tr. 369 -where the physical therapist reported that Ms. Moody was unable to tolerate sitting longer than five minutes). Ms.

Moody's back issues were then addressed by her physiatrist, Dr. Sonser (Tr. 542, 547). Dr. Sonser observed that Ms. Moody had diminished sensation to light touch throughout the bilateral lower extremities from the feet to the knees (Tr. 539, 542).

In early 2012, Ms. Moody's treating PCP, Dr. Raguindin, noted her drop in activity level coupled with fatigue, decreased energy, shortness of breath, and lightheadedness (Tr. 396 – this physician also noted that **despite pain medications Ms. Mood was unable to perform much of her previous activities secondary to the aggravation of her symptoms** (emphasis added).   Furthermore in January of 2012, Dr. Raguindin opined that Ms. Moody's "**pain limits her ability to do regular work because standing, sitting, and lying down for long causes increased in the pain to levels which she could not tolerate**" [sic] (Tr. 395) (emphasis added).[5]

> [5] In direct contrast to Dr. Raguindin's opinion (who has been a central player in Ms. Moody's medical care), a State Agency source reviewed Ms. Moody's records in February of 2012 (just one month after Dr. Raguindin's opinion) and concluded that she could perform a limited range of light work (Tr. 99-102, 395).

Plaintiff had a slow gait, 5/5 strength, tender cervical and lumbar spinous processes, and generalized moderate tenderness over the neck and shoulder girdle (Tr. 397).   Plaintiff's cervical spine movement was mildly restricted, and her cranial nerves were intact (Tr. 398).

In addition, Dr. Raguindin referred Ms. Moody to Sachin R. Shenoy, at the Neurology Headache and Pain Center (Tr. 462-72, 550-76).   Dr. Shenoy noted that Ms. Moody was now struggling with increased pain with prolonged sitting, standing, and lying down (Tr. 465).   In addition, she was having no symptom relief from her medication regimen of Tramadol and Nucynta (Tr. 465); see also (Pl.'s Br. 12).   On examination in January 2012, Plaintiff exhibited 5/5 motor strength, symmetric and normal deep tendon reflexes, and a normal gait (Tr. 466).   Dr. Shenoy noted multiple areas of pain and tenderness along the large joints and areas consistent with fibromyalgia (Tr. 466). Fibromyalgia and chronic pain syndrome were noted as another explanation for her complaints and different medications were prescribed (Tr. 466). On her next return visit to Dr. Shenoy, Ms. Moody was now experiencing daily headaches (Tr. 468).   Plaintiff reported her pain was not as intense as before and that the medication was working for her (Tr. 468).   On examination, Plaintiff exhibited 5/5 motor strength in all four extremities, symmetric and normal deep tendon reflexes, reduced sensation on the left hand, a normal gait, normal tandem, and normal finger-nose testing, as well as pain and tenderness in areas consistent with fibromyalgia (Tr. 469). And she had elevated CRP (C-reactive protein)[6] and sedimentation rate (this test is done to find out if inflammation or infection is present)[7] (and was labeled with the diagnosis of migraines) (Tr. 468-69).

Consequently, Ms. Moody began experiencing numbing, painful, coldness in her feet with a slow gait (Tr. 531, 533).   By mid 2012, Ms. Moody expressed to Dr. Shenoy that her medications were no longer working for her, and she was having joint pain along with daily headaches (Tr. 557).   Her medications were adjusted which helped (Tr. 553, 556).

- 4 -

[6] "CRP is a non-specific test. It is used by a doctor to detect inflammation if there is a high suspicion of tissue injury or infection somewhere in the body"[sic] http://labtestsonline.org/understanding/analytes/crp/tab/test
[7] http://www.webmd.com/a-to-z-guides/sedimentation-rate

An EMG on her lower extremities was performed in May of 2012. This test uncovered the development of neuropathy (Tr. 568-70 - performed by her treating physician, Dr. Shenoy).[8]  Dr. Shenoy noted the abnormal nerve conduction study is consistent with a mild sensorimotor axonal neuropathy and the EMG of the muscles was normal (Tr. 570).   A July 25, 2012, CS MRI demonstrated: (1) C4-5 right sided disc protrusion compressing on the right cervical spinal cord, stenosis of the central spinal canal, and moderately severe amount of right (mild amount on left) neural foraminal stenosis and (2) disc protrusions at C5-6, C6-7 and C7-T1 (Tr. 591-92); see also (Tr. 593 - where an x-ray performed on the same date showed some DDD at C4-5 with some posterior spondylosis (degenerative osteoarthritis of the spine)).

Despite numerous avenues of conservative treatment, Ms. Moody's sharp pain symptoms persisted in her neck, shoulders, and forearms (Tr. 585, 588).   Ms. Moody now was experiencing new pain towards the back of her head (Tr. 551).   Therefore, Dr. Smith recommended an anterior cervical discectomy and fusion (Tr. 586-87, 589).   On August, 15, 2012, Ms. Moody underwent major cervical spinal surgery and was provided a bone growth stimulator (Tr. 579, 581-84).   A post surgical CS x-ray in October of 2012 indicated some foraminal encroachment remained bilaterally (apparently at C4-C6) along with decreased range of motion (Tr. 594); Cf; (Tr. 590 -an August 16, 2012, CS x-ray (taken right after Ms. Moody's cervical fusion) demonstrated some early DDD).   The impression was "[p]ost operative change and mild degenerative change" (Tr. 594).

In May of 2012, Dr. Sonser performed bilateral facet joint injections at L4-5 and L5-S1 (Tr. 400, 536, 543, 545).   This provided no significant relief for Ms. Moody (Tr. 536).   Ms. Moody continued with pain in her low back pain and intermittent paresthesia in her legs (Tr. 535, 608).   Due to her complaints, Dr. Sonser referred Ms. Moody to a rheumatologist (Tr. 608).   Specifically, Carol Gracia, ARNP, examined Plaintiff at Space Coast Rheumatology Arthritis (Tr. 602-09).

[8] Of note, Ms. Moody's diabetes was also a link concerning the issues with her lower extremity problems (568-70 - where this EMG noted the results were consistent with a pattern of chronic diabetes).

Ms. Moody began regular treatment with Space Coast Rheumatology Arthritis in an attempt to unravel the medical mystery underlying her complaints.   On her initial visit, Ms. Gracia observed restricted forward and side bending of the cervical spine; restricted forward and lateral bending of the lumbar spine; SI (sacroiliac joint) tenderness; painful range of motion in most of her joints; mild OA (osteoarthritis) changes of the hands, wrists, and shoulders (bilaterally); tender bilateral GTB (greater trochanteric bursitis) and of the knees; and 11/18 tender points for FM (fibromyalgia) (wincing at pain with signs of allodynia)[9] (Tr. 608).   Ms. Moody had a flat/dull affect and was tearful at different points during the examination (Tr. 608-09).   She was started on Cymbalta and Flexeril (Tr.

609).   On her follow up visits, Ms. Moody's continued to report pain (in multiple joints including pain in her legs, shoulders, back, head, hands, wrist, and knees); swelling of the knees, wrists, and ankles; and a burning sensation in her knees (Tr. 602, 604, 606) Her medications were again adjusted (Tr. 606 - where Lyrica was added to her medication regimen); see also (Tr. 604 -where her Lyrica was increased).

Ms. Gracia searched onward for answers to Ms. Moody's health dilemma ordering numerous diagnostic tests to uncover her medical riddle.   Specifically, Ms. Gracia wanted to perform a complete laboratory work[10] up to investigate Ms. Moody's symptoms which included x-rays of both of her knees (Tr. 603, 605).   But the last visit in the record indicated that laboratory tests/x-rays still needed to be procured (Tr. 40-41, 602).

> [9] "Allodynia is pain, generally on the skin, caused by something that wouldn't normally cause pain. Many people with fibromyalgia report having this symptom." [sic]
> http://chronicfatigue.about.com/od/glossary/g/allodynia.htm
> [10] These updated laboratory results were not obtained for Ms. Moody's hearing.

Ms. Moody has "pain all over" (Tr. 40-41, 602).   Luckily, her husband is always right where she needs him (Tr. 57- 72-74).   He assists her with such things as showering/washing her hair, dressing, and tying her shoes (and even with basic hygiene after using the bathroom).   Id.

### III. The ALJ's Decision

In determining whether an individual is disabled, the Commissioner must follow the five-step sequential evaluation process codified at 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).   Specifically, the Commissioner must determine whether the claimant (1) is currently employed; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically equals an impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy.   See Phillips v. Barnhart, 357 F.3d 1232, 1237-1240 (11th Cir. 2004).   The claimant bears the burden of persuasion through step four and at step five, the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); Phillips, 357 F.3d at 1241 n.10.

At step one the ALJ found that Plaintiff has not engaged in substantial gainful

activity since her alleged onset date (Tr. 23). At step two, the ALJ determined that Plaintiff had the following severe impairments: diabetes mellitus, degenerative disc disease of the cervical spine status post fusion, degenerative joint disease of the right shoulder, degenerative disc disease of the lumbar spine, fibromyalgia/polyarthiritis, and morbid obesity (Tr. 23-24). At step three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 24-25). Before proceeding to step four, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to:

> lift/carry 10 pounds occasionally, 5 pounds frequently; stand up to two hours in an eight-hour day, sit up to six hours in an eight-hour day, can walk one block at one time, can occasionally climb stairs, stoop or balance; can never kneel, crouch, crawl, or climb ladders; she can only occasionally reach with both arms; and must avoid more than occasional exposure to humidity/wetness and avoid all exposure to hazards.

(Tr. 25).

At step four, the ALJ determined that Plaintiff is unable to perform her past relevant work, but the ALJ concluded, based on the testimony of a vocational expert, that there are jobs in the national economy including dispatcher, receptionist, and ID clerk that Plaintiff can perform (Tr. 29-30). Based upon this evidence and his other findings, the ALJ held that Plaintiff has not been under a disability, as defined in the Act, from November 12, 2010, through the date of the decision (Tr. 30).

## IV. Standard of Review

The scope of the Court's review is limited to determining whether the Commissioner applied the correct legal standards and whether the Commissioner's

findings are supported by substantial evidence.  Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "more than a scintilla but less than a preponderance.  It is such relevant evidence that a reasonable person would accept as adequate to support a conclusion."  Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178 (11th Cir. 2011) (citation omitted).  When the Commissioner's decision is supported by substantial evidence the district court will affirm even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the preponderance of the evidence is against the Commissioner's decision.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).  The district court "may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]"  Id.  "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision."  Foote, 67 F.3d 1533, 1560 (11th Cir. 1995) (per curiam); accord Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (the court must scrutinize the entire record to determine the reasonableness of the factual findings).

## V. Discussion

My discussion begins with Plaintiff's third contention because I find it to be dispositive of the case.  Plaintiff argues that the ALJ did not adequately consider all of her impairments when determining her RFC (Doc. 19 at 15-24).  A person's RFC is:

> A medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s).  RFC is the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs.

SSR 83-10, 1983 WL 31251 (S.S.A. 1983).

Plaintiff's RFC assessment does not include limitations for headaches. Plaintiff began having headaches in 2011 and that at times they have been so intense that she has sobbed and retreated to the dark (Tr. 441, 555). Plaintiff's headaches are well documented in her medical records (Tr. 63-65, 330, 335, 340, 441, 443, 465, 468, 531, 541, 551-554, 556-557, 559, 604, 626, 631, 635). At step two of the sequential evaluation process the ALJ recognized Plaintiff's long history of migraine headaches (Tr. 24). The ALJ wrote that by June, 2012, the frequency and severity of Plaintiff's headaches had been reduced by medication (Id.). Then the ALJ said:

> The claimant did not report headaches after surgery in August 2012 (Exhibit 17F). Given the fact that the claimant's headaches did not pose more than minimal functional limitations for 12 months or more, the claimant's headaches are considered a nonsevere impairment under the criteria set forth in the Regulations."

(Id.). This statement is wrong. Plaintiff continued to complain of headaches in September and October of 2012 (Tr.551, 554, 604, 626). At the administrative hearing she testified that she has migraines two to three times per week which last all day (Tr. 64). When Plaintiff has a headache she turns off the lights and closes the door (Id.). She lays down for ten minutes, then she has to sit up in bed and then she tries to lay down again or she will stand up and lean against a wall (Tr. 65). Plaintiff said she is unable to drive because of her migraines (Id.). This is significant because the vocational expert testified that a hypothetical person who missed more than three days of work per month would be unemployable (Tr. 80-81).

The Commissioner argues that any error is harmless because Plaintiff failed to demonstrate what functional limitations result from her headaches. See Davis v.

- 9 -

Barnhart, 153 Fed. App'x 569, 572 (11th Cir. 2005); Wind v. Barnhart, 133 Fed. App'x 684, 690 (11th Cir. 2005) (claimant must show the effect of the impairment on her ability to work). The Commissioner's argument misses the point. Because the ALJ was wrong about the length of time Plaintiff has suffered from debilitating headaches, there is not substantial evidence to support the ALJ's conclusion that Plaintiff's headaches are not a severe impairment. The Court cannot speculate about whether the ALJ would have found Plaintiff's headaches to be a severe impairment had the ALJ realized that they continued for more than one year. The Court also cannot speculate about whether the ALJ would have included a limitation for headaches in Plaintiff's RFC assessment had the ALJ not misapprehended the facts.

This is not the only problem with the ALJ's analysis. The ALJ found that Plaintiff is severely impaired by fibromyalgia (Tr. 23). "[Fibromyalgia] is a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, 2012 SSR LEXIS 1, at *1. A diagnosis of fibromyalgia - literally meaning "pain in the muscles and the fibrous connective joints (the ligaments and tendons)" - depends mostly on a person's own subjective reports of symptoms, namely pain. Stewart v. Apfel, 2000 U.S. App. LEXIS 33214, at *7 (11th Cir. 2000).

The Commissioner issued SSR 12-2p to assist factfinders in the evaluation of fibromyalgia. SSR 12-2p, 2012 SSR LEXIS 1, at *1. Social Security Ruling 12-2p "provides that once a claimant is determined to have fibromyalgia her statements about symptoms and functional limitations are to be evaluated according to the two-step process set forth in SSR 96-7p, 1996 SSR LEXIS 4." Tully v. Colvin, 943 F. Supp. 2d 1157, 1165 (E.D. Wash. 2013); see SSR 12-2p, 2012 SSR LEXIS 1 at *13. "These

policies provide that '[i]f objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all other evidence in the case record.'" Id. (quoting SSR 12-2P, 2012 SSR LEXIS 1).

The ALJ discredited Plaintiff's reports of pain because of her "relatively minor examination findings." (Tr. 28). In relying exclusively on the objective medical findings the ALJ committed error. "It is a misunderstanding of the nature of fibromyalgia to require "objective' evidence for a disease that eludes such measurement.'" Par. v. Colvin, 5:15CV47-CAS, 2015 WL 5190719, at *11 (N.D. Fla. 2015) (quoting Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003)). "[P]hysical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." Green-Younger, 335 F.3d at 108-09 (citation omitted). "[S]welling of the joints is not a symptom of fibromyalgia ...." Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996). "The Eleventh Circuit adopted this reasoning in an unpublished decision, Stewart v. Apfel, No. 99-6132, 245 F.3d 793, 2000 U.S. .App. LEXIS 33214, at *8-9, 2000 WL 33125958 (11th Cir.2000) (table)." Par, 2015 WL 5190719, at *11. The ALJ's sole reliance on objective medical findings to discount Plaintiff's testimony concerning the effects of her fibromyalgia was error which requires remand.

The ALJ discredited Plaintiff's testimony in part because "[t]he claimant has declined her doctors' request that she pursue cognitive behavior therapy to address her disproportionate pain reports and weight loss …)." (Tr. 28). "The Secretary may deny … disability benefits if the Secretary determines that 1) the claimant failed to follow a prescribed course of treatment, and 2) her ability to work would be restored if she had

followed the treatment."   Lucas v. Sullivan, 918 F.2d 1567, 1571 (11th Cir. 1990) (citing McCall v. Bowen, 846 F.2d 1317, 1319 (11th Cir.1988); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987); 20 C.F.R. § 404.930 (1989)).

An inability to pay excuses noncompliance with recommended treatment. Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (collecting cases).   According to Dr. Patrick Sonser's medical records, Plaintiff has declined cognitive behavioral services for weight management and/or pain management in the past secondary to or due to copayment issues (Tr. 536, 539, 540, 542).   The ALJ failed to recognize or discuss Plaintiff's possible inability to pay for care.

Additionally, an ALJ may not draw an adverse inference from a claimant's failure to pursue recommended treatment without inquiring about the claimant's reasons for not doing so, and addressing those reasons in the decision.   Lucas v. Sullivan, 918 F.2d 1567, 1572-73 (11th Cir. 1990) Dawkins, 848 F.2d at 1214; Social Security Ruling 96-7p, 1996 WL 374186, at *7 ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").   If a claimant has a good reason for not pursuing a course of treatment, such as inability to pay, the ALJ may not punish the claimant for not doing so.   Dawkins, 848 F.2d at 1214.   At the administrative hearing the ALJ erred by failing to ask Plaintiff why she had not obtained recommended treatment.

Remand is warranted for these reasons which is why I do not address Plaintiff's remaining assignments of error.   Freese v. Astrue, No.8:06-cv-1839-T-EAJ, 2008 WL

- 12 -

1777722, at *3 (M.D. Fla. April 18, 2008) (citing <u>Jackson v. Bowen</u>, 801 F.2d 1291, 1294 n.2 (11th Cir. 1991)).

## VI. Recommendation

Upon consideration, I **RESPECTFULLY RECOMMEND** that:

1. The Commissioner's final decision be **REVERSED and REMANDED** for further proceedings consistent with the findings in this report.

2. The Clerk be directed to enter judgment accordingly and **CLOSE** the file.

3. Plaintiff be advised that the deadline to file a motion for attorney's fees pursuant to 42 U.S.C. § 406(b) shall be thirty (30) days after Plaintiff receives notice from the Social Security Administration of the amount of past due benefits awarded.

4. Plaintiff be directed that upon receipt of such notice, he shall promptly email Mr. Rudy and the OGC attorney who prepared the Commissioner's brief to advise that the notice has been received.

## VII. Notice to Parties

A party waives the right to challenge on appeal a finding of fact or conclusion of law adopted by the district judge if the party fails to object to that finding or conclusion within fourteen days after issuance of the Report and Recommendation containing the finding or conclusion.

**RESPECTFULLY RECOMMENDED** in Orlando, Florida on December 18, 2015.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

    Presiding United States District Judge
    Counsel of Record